Good morning, Justices. My name is Ian Corzine. I represent Appellant and Plaintiff Pestmaster Services, Inc. in this proceeding today. In June of 2011, IRS agents stormed the offices of Pestmaster in Bishop, California, and they had one question. Where is our $410,000? It had turned out that the agency was owed $410,000 as a result of a failure to pay payroll taxes. Mr. Jeff Van Deepen, who was the president of Pestmasters, was shocked. His business was almost destroyed. He said he promised the IRS he's going to get to the bottom of this particular issue. And so he did. He looked into it, and he found out that his payroll tax company had committed fraud and taken close to $400,000 in payroll taxes and spent it on various retailers, such as QVC, Home Shopping Network. I'm sure that all of us are familiar with the facts, so you don't need to run through the whole summary. Maybe you can just jump into the policy language. This is a very narrow set of issues we're focused on. And why don't you just focus on the computer fraud provision? I think that's your best hope, in my personal opinion. Okay, so let's hear what you have to say about that, rather than give us the lengthy wind-up that we are already familiar with. All right, yes, Your Honor. There will be two discussions today that you'll hear most of the discussions about. The first one is computer fraud, as the Justice has just brought up. This type of coverage in the traveler's policy covers the insured for direct loss caused directly by computer fraud, and computer fraud is any use of any computer to fraudulently cause a transfer. And that is the type of coverage that we're going to discuss today. In the district court opinion below, and also in traveler's briefing, we have a discussion about fraudulently cause a transfer versus cause a fraudulent transfer. And there's some sort of significance attributed to these phrases by travelers. However, in the case law, you see no significance related to this. And actually, if you conduct a plain meaning review of this particular policy provision, you'll see that there really isn't a difference between fraudulently caused and cause a fraudulent transfer. The coverage in kind of broad terms covers a specific use of a computer to commit a fraud. And so in this particular case, we submit that there is no significant difference between those two different phrases. Travelers in the district court below discussed the universal case, and they also discussed the bright point case as somehow supportive of this concept of a difference between these two phrases that, again, don't exist in case law or the policy. However, these cases are inapplicable. With respect to the universal case, the particular coverage at issue was fraudulent entry into a computer system. We have a situation in which it is computer fraud and it's use of any computer. And the key word is use, not entry. And therefore, the universal case really doesn't apply. With respect to the bright point case that travelers in the district court has relied upon, we have a discussion about phone cards, which is the subject of the fraud. And these phone cards were not in the possession of the insured at the time of the fraud. And as a result, it didn't qualify for computer fraud coverage, which requires a transfer from the inside to the outside. You know, yeah, you've laid that out well in your briefs, but none of those cases is binding on us here. Correct. I guess, so I don't really find them all that helpful. I guess I'm struggling with this. It seems to me that this particular provision that you focused on could be read in one of two ways. It could be read to say that the transfer itself has to be unauthorized, right? I think that's what I want to hear from a defendant, but I think that's the way that they say it should be read. Or it could be read to cover an authorized transfer that was fraudulently induced. And I think that's what you're trying to persuade us, right, that you're not saying that the actual transfer of the funds from your client's bank account to, was it priority one, was unauthorized, meaning there was a standing. I assume that there was an invoice that was sent that was approved, but your position is that they never intended to forward the money to the IRS, period, right? And so it was a fraudulently induced but nonetheless authorized transfer, and you think that that's still covered. Well, yes, I want to make sure that we have a distinguishment of terms in that situation. Certainly there's no dispute that priority one submitted an invoice to us, and it said payroll taxes, $18,000. We said, sounds good, all right? There's no dispute about that. However, the actual policy language is authority or consent. And in our situation, we don't believe that there was consent because there was. Where is authority? Are you talking about the computer fraud provision? Well, what I'm talking about, yes, it's a computer fraud condition, yes. Okay, where does it talk about consent? Well, I guess what I'm trying to get at is maybe I shouldn't have used the actual provision of the policy for that, but I want to distinguish between authority and consent in this situation. Even let's just use them simultaneously. There was not a. You're trying to argue that authority means consent. Yes. Okay. And also I'm trying to. Okay. Okay. And so then how you interpret consent, that it would have been later approval, subsequent approval. Well, I guess what I'm trying to say is that there was a preconceived plan to misrepresent and commit fraud. And as a result, that consent, if there was any consent or authority, was invalid. And so all I'm trying to say is if you're going to. I wanted to make sure that we were clear on this authority part. As you said, you know, there's no dispute that it was authorized. Well, yeah, there's no dispute that we said, okay. However, we have to analyze that in the context of the fact that there was a preconceived notion to take our funds and use it in a different manner. Okay. Yes. That begs a question for me, and that's why Pestmaster and Party, did they have a contract for services? Yes. And did this not cover, would this not have covered these withdrawals that were fraudulent? Well, the unique circumstances of this case are Pestmaster had a written contract with HR Connections for various HR consulting issues. As time went on, this HR consulting company said, hey, listen, we also do payroll. And so there was an oral contract relating to processing of the payroll. It had to do with, you know, $2 or $3 per paycheck. Does that shed any light on the scope of authorization? I mean, because I didn't see anything, and I think that would be critical to your case. No, I don't think it does, because I think that the invoices, which say payroll taxes, $18,000, are a representation that they're going to use the monies taken from the Pestmaster account for payroll taxes. But the policy or the document also says that Pestmaster has suffered a direct loss. Sure. So let's focus on that, if we can, just for a minute, because as I understand it, you know, Pestmaster did not suffer a loss the moment, as you were just discussing, the moment the withdrawals were made, because it was expecting that money to be withdrawn by priority. I mean, so, and it was, right? Well, no. Our position, Pestmaster's position is, of course, that the actual loss was caused at the moment that Priority 1 transferred the money from Pestmaster. Was it really? Because at that moment, they signed off on it just like the understanding was and like they had been. After they signed off on it, the employee then, instead of putting it into the payroll tax account, put it into his personal bank account. And I know you're trying to argue that this language covers that, but I'm having a little bit of difficulty seeing, and I know there's, you're trying to focus on the authorization, but there's also this direct loss that you have to take into account. Yes, and I think that an example or two would actually help understand that. You'll see in the Steve Lee Expert Report, which is at ER 1040 through 1046, a description of how those funds were taken in. And that description shows in three separate examples, actually four, that at the moment that a Pestmaster transfer, HCH transfer, occurred, there was a negative balance in the Priority 1 account. And so what happened, how we have a direct loss in the situation is that when that money was transferred, that money immediately went to pay the obligations of other clients, Priority 1 itself, whatever. It certainly didn't go to the payment of payroll taxes or employee salaries at that point. It went to satisfy that incomplete balance. You're arguing that when Priority 1 sent the invoice trying to get the money from your client, that it had at that moment no intention of ever forwarding the money to the IRS? Oh, yes, very much so. The intent at that point in time was to use the funds indiscriminately. And, again, that is shown in our Fraud Expert Report, where we have a situation where the business was losing money before they even met Mr. Van Diepen. We had a very experienced and smart in the financial world president. She had a history of using these funds for personal purposes before, and she not only did it at the beginning when they started taking funds from Pestmaster, but continued on over time. So, yes, that has set us up. Can I just ask you to clarify this? Am I right in thinking that travelers moved for summary judgment, but you did not cross-move for summary judgment? No, that's correct. You think there's a triable issue that a jury needs to be? So what's the disputed issue of fact then? Well, there's a number of them, as you may be able to tell from the record. But, yes, just to kind of summarize, what Pestmaster is requesting here is just an opportunity to go to trial. We just wanted to bring this forward. What are the issues of fact? What gets you to trial? Well, I think that there's an issue of fact concerning use of the computer that caused a or fraudulently caused a transfer. I think there's a situation about an analysis of various different facts about whether or not there was a direct loss. In this case, we believe that we have a scintilla of evidence, at least, if not can establish the fact that there was a direct loss in this case. So direct loss applies to both funds transfer fraud and also computer fraud. And I think that, again, there's numerous tribal issues of fact that we believe should be decided by a jury. Was there an invoice and, therefore, at least authorization to access the Pestmaster account for each and every withdrawal that was made? Yes. Yes, Your Honor. Regarding these five pay periods? Yes. Because we're only talking about five quarters that the payroll taxes weren't paid. Every time a withdrawal was made, it was pursuant to an invoice that Pestmaster had submitted to Priority One. Actually, that Priority One had submitted to Pestmaster for approval. Priority One, right. That's right. And had the approval of Pestmaster. Pestmaster said, okay, these are the employee salaries, this is the payroll tax, go ahead and pay these amounts. That's right. So we have a record of dozens and dozens. Go ahead and access our account. Correct. But, I mean, isn't this computer fraud provision mostly used for, like, hackers? No, Your Honor. As you may see in the Owens case, the Owens v. Travelers case, other courts have looked at this. And, again, it's not binding necessarily on the court, but it's good to review. Other courts have construed this exact same coverage provided by Travelers and said, no, it's not limited to just instances of hacking. And, frankly, taking a common sense approach to this coverage, if you just look at it, it's use of any computer. It's not a situation where Travelers. Fraudulently use. Pardon? Fraudulently use a computer. Well, to fraudulently cause a transfer, correct. However, the beginning part of the phrase is actually any person, any use of any computer. And so what I'm trying to get at is that this is a broad coverage, and the insured should be entitled to a plain meaning review of this coverage. So that he can make a decision whether or not he needs to get more coverage or that he needs to, you know, have this risk that's out there. And I got to tell you that, you know, there's an argument that, oh, you know, this will lead to a situation where any touching of a computer that comes into fraud is now going to be compensable under this clause. It's not that case. This is a situation where a computer was specifically used to affect this fraud at every stage of the game. It was to send the invoices. It was to get the okay. And it was to affect the ACH transfer. So it was a specific computer use that affected the fraud. I'm still having trouble with your direct loss. So tell me, give me your best argument on direct loss. Because what happened here is you had an agreement with priority that they would do your payroll taxes. And it's not like they took the money without you knowing it or without you authorizing it. There was a sign-off for each authorization. It's like, okay, you're taking the money. You signed it off. You signed off on it. Then after that, you agree, that individual who then took the money went and instead of putting in the payroll tax, he put it in his own bank account. Is that correct? Yep. So it looks like the district court said that PestMester had not sustained a direct loss under either provision because its alleged loss was entirely contingent on a series of events and decisions, including priority one's decision to divert the funds in its account to pay its own obligations instead of using them for their agreed-upon purpose of paying PestMester's federal payroll taxes. So why doesn't that reasoning support that there wasn't a direct loss here? Well, first of all, Your Honor, I want to just request that I reserve a minute at least to do a rebuttal if that's all right. Go ahead and proceed, and I'll deal with your time in a little bit. Thank you, Your Honor. Why doesn't that? Well, there's a number of reasons why. First of all, the fundamental answer to the question is that, you know, why doesn't a series of events that take place between the cause of the loss and the loss make it not a direct loss? My argument is that if you ever did that analysis, you would never have a direct loss because there's always different steps that are taken, especially in a fraud case where there's multiple elements. What the real significance or what the court should focus on is significant intermediate steps. And I've got to tell you, this is a case not like Methodist, where we have an investment that takes place four times removed from Bernie Madoff. This situation, we have two parties, two parties, and one says, I'm going to pay your payroll taxes for $3 a paycheck and doesn't do it. So there isn't a whole bunch of steps that result in the loss. There's a situation where there's a preexisting intent to defraud. There is a misrepresentation as to how the funds are going to be spent. And then there is a taking of that money and then use of it for, you know, personal purchases. So, Your Honor, I believe that the district court was in an error in stating that. And all the cases the district court considered were ones that had much more, many more steps than the situation we have. All right, thank you. And then I'll give you a minute for rebuttal. Thank you. Good morning, Your Honors. Gary Valeriano of Anderson McFarland & Connors for Travelers. Good morning. What we have here is a real simple business dispute. It's an interpretation of two provisions of a contract. It sounds like the court may not want to hear more on the funds transfer fraud, so I won't go into that. Yeah, so just focusing on the computer fraud provision. Yes. Why can't it be read to say, and I'll just put it in my terms, an authorized transfer that was fraudulently induced? It seems to me that's what we're dealing with here, right? Right. Okay. And then I look at the language and it seems completely, that kind of transfer seems to fall right within the language of the policy. To address the question, I think there are three clauses in this policy which show why hacking has got to be the incident involved. It has to be the invasion of a computer. Well, no. No. Let's just read the provision together because it doesn't say anything about an invasion of a computer. It says the use of a computer, and you're not going to dispute that a computer was definitely used to perpetrate this fraud, right? Yes, a computer was used somewhere. At every step. Yes, somewhere. Okay. So the use of any computer, so it doesn't have to be the insurance computer, it could be Priority 1's computer, but in this instance it's actually both, to fraudulently cause a transfer. And I guess that's what I stop there and I say to fraudulently cause a transfer. Well, isn't that what happened here? If we credit your opponent's assertion that they're taking the position that at the time the invoice was sent from Priority 1 to Pestmaster, the Priority 1 folks never intended to send one penny of the money they were going to get onto the IRS. So it's just fraudulent from the very get-go. Why isn't that covered by the plain language of the policy? Well, factually that's not correct. That was not the situation with Priority 1. It wasn't. Priority 1 did pay their taxes for 2009-2010. Right, but the transfers we're talking about are the ones where the money wasn't sent on. And your opponent is taking the position not that they win, but rather that there's a factual dispute as to whether at the time the request for the approval was made, whether they never intended to send the money on. And it seems to me that's probably right. You're certainly disputing that. They're taking the position that there was a fraudulent intent at the outset. And so why wouldn't we send this on for trial on that issue? Well, because the coverage involves the use of any computer to fraudulently cause a transfer. That is different from the use of any computer to cause a fraudulent transfer. That makes no sense to me. I saw that in the papers. But there's no difference between those two formulations, is there? Well, let's use the Universal American case as an example. That involved a very different coverage, but it was computer fraud coverage. But the computer fraud coverage in Universal American prohibited the fraudulent entry of electronic data into a computer. Okay? The fraudulent entry of electronic data into a computer. The court there said exactly that it required the manipulation of the computer, not the manipulation of a human being. Now, what plaintiffs would do in this situation is simply read the fraudulent entry of electronic data into a computer as this. Entry of fraudulent data into a computer. And that's two different things. One is determined by the use of the machine to fraudulently cause, effectuate. The other is determined by the quality of data that goes into that machine, whether it's corrupted or whether it's pernicious. And that is the same as here. Let me cite this court to another case, which just came out in January of 2016. It is a state court case opinion out of Illinois. It is entitled Kraft Chemical Company versus Federal Insurance Company. It is cited at 2016 Illinois Circuit, Lexus 1. And that case dealt again with computer fraud. Different policy provision. In that case, the covered event was the unauthorized entry of electronic data into a computer. The court went through that and found that what was prohibited was unauthorized access to the computer. The invasion of a computer by someone not authorized to do so. And that court went through the two cases that it relied on in reaching its conclusion. Universal American. And it found that the unauthorized entry of data into a computer was the same as the fraudulent entry of electronic data into the computer. It also cited favorably the district court opinion here in Pestmaster. And it said that the fraudulent cause of transfer was the equivalent of unauthorized entry and fraudulent entry. In other words, it is the manipulation of the machine. The adverb fraudulently modifies the verb cause. It does not. It is not an adjective that modifies the transfer. Yes, you can have fraudulent transfers in a number of different situations. But in order to have one fraudulently caused, i.e., the fraudulent entry, the unauthorized entry, you need to have access to that machine. And that's why this is covered. I'm sorry. That's why this is not covered. So, you know, in terms of that, we also have to look at other phrases used in the policy. As the Justice said, the direct loss provision. In this case, what is the direct loss? Well, we have trouble figuring out the direct loss. Because why wouldn't we send that then to the jury as a material fact? Well, no. No, but I'm asking because I. . . I think the direct loss is very clear. The direct means immediate. So that is the immediate loss that you suffer. So. . . Let me just take the best factual scenario for the plaintiffs here, which is that at the time Priority 1 sends the invoice, let's say it was for $18,000. Sorry, you're having trouble hearing me. At that time, Priority 1, the folks at Priority 1 do not intend to send one penny of that money to the IRS. They already have formed the intent. We're going to get this $18,000 under false pretenses. We're going to keep it and use it to pay our mortgage or whatever else they were doing with it, right? So as soon as Pestmaster sends the $18,000, that money is gone. There's no intervening event that's going to occur. They've already. . . Right? So just take that factual scenario and explain why the direct loss provision. Well, see, if we're talking about direct loss and immediate, first of all, we've conflated a couple different things here. If the fraud is really the cause of the loss, not computer fraud, but the fraud that we're talking about from Pestmaster, that started earlier. So that there is no direct loss. There is no immediate loss because it takes some time for them to engineer their fraud. When they send the money to. . . That's the use of the computer. Let's just. . . Because that's one of the uses of the computer that's covered. So when the money is transferred electronically by computer from Pestmaster's account to Priority 1's account, right? Correct. And the money hits Priority 1's account, they've already decided we are not going to forward this money on to the IRS. So why isn't that a direct and very immediate loss to Pestmaster right then? Pestmaster has a contractual right from Priority 1 to have those taxes paid. Those taxes were not paid that same day. The taxes went into a non-segregated account. It could have been that Ms. Branzuela decided that day, I'm going to pay these taxes instead of paying something else. But she didn't. She could have made some money from a different client. Remember, she had other clients. But she didn't. But she didn't. She had already. . . But it was contingent. Hang on, hang on. I asked you to assume because it's the plaintiff's best case scenario in terms of the facts, that at the moment Priority 1 got the money, they never intended to send one penny of it to the IRS. Okay? So forget about all of these other scenarios that you tried to spin out in your brief about, well, the taxes weren't due for a few more days and maybe they were still debating whether they were going to send the money on. Fine. If that's the scenario, you probably win. But let's take the best case scenario for the plaintiff. Under the scenario I just painted, tell me how that's not a direct loss. As soon as the money hits Priority 1's account. Well, it's a direct loss, but what was the cause of that loss? The clause has to be read in conjunction. Remember, it's a direct loss directly caused by computer fraud. So, in other words, what was the direct cause of the direct loss? And it was the provision of money, authorized money, by Pestmaster to Priority 1. It was done pursuant to their contract. Let me ask you. I found, unless you had more. It seems like in Pestmaster's statement of additional facts, I think it's at ER615, paragraph 61, Pestmaster stated that Priority withdrew $11,991.89. That was never signed off on by Pestmaster and never appeared in any invoice. So, and I know it's $11,000 versus the other amounts of money, but it looks like that was never signed off on and never appeared in any invoice from the pleading. It wasn't addressed. They didn't really highlight. I found it. Viewing the evidence of that fact and the like most favorable to Pestmaster, why wouldn't there be coverage for that amount? Again, because of the fact that a computer was not invaded. Well, but here you make an interesting argument based on the fact that, you know, it was not authorized. I mean, we have to look at the authorization. On all these other ones, you know, they were signed off on by Pestmaster, but this one was not signed off on by Pestmaster. So how was it authorized? Your Honor, I don't know the facts of that. I'm sorry. Well, let's just assume, if you don't know the facts, let's assume there was some monies that they didn't authorize because you made a point to say, well, they authorized, they signed off on the invoice, they signed off on this invoice. So basically, you know, they knew about it, and so therefore, you know, it was wrong. If that's a computational error, I don't know. But if what you're saying is that they somehow invaded their computer without their authority and took that money, then yes, I would assume that would be covered. But I don't think they've ever alleged that. I don't think there's ever been an allegation of unauthorized use of money. That's why I asked the question of Counsel for Travelers. Yes. Because of this entry at record at ER 615 that suggests that there were some withdrawals that were not authorized. You know, Your Honor, I'm sorry. I'm unaware of that. I really can't address that. It's just there's been no allegation of theft. The allegation has been the nonpayment of taxes. Remember, the loss here is the money they had to pay the IRS, so that the money that was paid to the IRS was the focus of the claim. And that money was the money that was supposed to be transmitted by Priority 1 through their contract to the IRS. That's the loss in question here. Money was obtained by Priority 1 for other purposes, for example, child support payments, things of that nature? Correct. All authorized as far as we know and are concerned. We say all authorized. What do you mean? Well, I've never seen evidence of an unauthorized transaction. There have been allegations that money is missing, but I've never seen an unauthorized transaction where money was transferred. I think there is at least one for that amount. So I was just curious what effect that might have if there was. The effect would be it would depend on whether or not that was an invasion of a computer, certainly. If I could just sum up, what we're looking at here, and to address the Court's question regarding what's covered, this type of scam has been going on since the beginning of time. I mean, you don't need a computer to do this. I can come to you. I can look at you. I can promise you anything if you give me your money, and you do. Maybe my charisma, maybe my I'm just very convincing. That happens. We have a little bit of technology. Now I have some writing, so maybe I can write you a letter and convince you to give me your money, and you do. Now we've progressed. I have the mail. I can send you a letter. Now we have a telephone. I can call you on the telephone and convince you to send me your money because I'm going to do something, but I don't. We go through telegraph, fax, computer. The question is, this really comes down to caveat emptor. Why would the insurance company essentially be the guarantor of all commercial transactions undertaken by the insured? Why would travelers provide coverage for this ancient scam, which has been going on for years, under the name of computer fraud? It makes no sense. What is covered here is exactly what we've said, which is supported by the Universal American case, which is cited by the Brightpoint case. By the way, the Brightpoint case is exactly the same language that we use here, fraudulently cause a transfer. Yeah, but so is that Owens case, equally nonbinding. It's exactly the same language, and they come out in the plaintiff's paper. The Owens case is different because they used approximate cost standard instead of directly cost, which is immediate. Remember, directly cost, I think, is a zero-sum game. It's the immediately preceding event which takes place. So in this case, the immediately preceding event which took place was the payment of taxes to the IRS, which they thought they had already paid. Yeah, I just, I'm not persuaded on that point. I mean, I hear what you're saying about the, does, I do question travelers' sanity in putting this provision in here because it does seem to be way, way too broad. But the remedy, obviously, is tell your client to redraft the provision. Your Honor, this is a smartphone. If I were to call you and say, I've got widgets I want to sell you for $5 less than widgets you could buy anywhere, and you agree you're going to use those widgets in your manufacturing process. So you say, sure, let's do it. I'll buy 1,000. I say, send me the money, and I'll send you 1,000 widgets. Well, this is a computer, right? And I have, in your words, fraudulently caused a transfer. I don't think that's true. I have caused a fraudulent transfer, but I haven't fraudulently caused a transfer because I didn't actually use your phone. So that's, I think, the distinction here, and I think my time is up, and thank you. Thank you for allowing me to have an extra minute. I just want to highlight a couple of things from the discussion below, and that was the universal case and the Kraft chemical case. Of course, that entire discussion depends upon a different type of coverage. It was a fraudulent entry into a computer system coverage, okay? And so you can argue. What is the use of the computer here to fraudulently cause a transfer? There's a couple uses. One is the transfer of the actual misrepresentation, the invoice itself. The invoice itself. So you would say there would be liability under this policy even if the payments were sent through the mail? Yes, and I also believe that part and parcel of this fraud was the ACH transfer. So it's any use of a computer to further a fraudulent transfer? That's correct. Okay. And as Justice Watford discussed, the remedy is simple. The prevalence of computers in society has been going on for a long time. All travelers would have to do is specify the use. They could change it to entry. They could change it to unauthorized access. They could do a variety of things. All we're asking in this case, Your Honor, is I believe that we have sufficient facts to create tribal issues, and one of them was highlighted by this Court itself concerning a disputed fact about whether or not a given transfer was authorized. Why didn't you argue that? I asked you that question. Yes. Was there any unauthorized access, and you said no? Yes. Well, Your Honor, the frank question is I wasn't aware of it. That's the answer. And so, therefore, just to conclude, we are asking the Court to reverse the decision of the District Court and allow Pestmaster to go before a jury and prove its case to get coverage. Thank you for your time. Thank you. Thank you both for your arguments in this case. The matter of Pestmaster Services v. Traveler's Casualty and Assurity Company of America is now submitted.
judges: Murguia, Watford, Vanaskie